IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

| | | |
|---|---|---|
| Multifamily Captive Group, LLC<br>7910 Woodmont Avenue, Suite 810<br>Bethesda, Maryland 20814<br><br>    Plaintiff,<br><br>v.<br><br>Assurance Risk Managers, Inc.<br>2851 S. Parker Road, Suite 760<br>Aurora, CO 80014<br><br>    SERVE:<br>    Registered Agent<br>    Lisa Isom<br>    Assurance Risk Managers<br>    2851 S. Parker Road, Suite 760<br>    Aurora, CO 80014<br><br>AND<br><br>Lisa Isom, individually<br>2355 Kelty Court<br>Franktown, CO 80116<br><br>    SERVE:<br>    Lisa Isom<br>    2851 S. Parker Road, Suite 760<br>    Aurora, CO 80014<br><br>AND<br><br>Networked Insurance Agents<br>988 McCourtney Road<br>Grass Valley, CA 95949-7400<br><br>    SERVE:<br>    Alford L. Johnson<br>    988 McCourtney Road<br>    Grass Valley, CA 95949<br><br>AND<br><br>California Apartment Association | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br><br><br><br>CIVIL ACTION NO. _____ |

| | |
|---|---|
| 980 Ninth Street, Suite 200 | ) |
| Sacramento, CA 95814 | ) |
| | ) |
| SERVE: | ) |
| Thomas K. Bannon | ) |
| Chief Executive Officer | ) |
| California Apartment Association | ) |
| 980 Ninth Street, Suite 200 | ) |
| Sacramento, CA 95814 | ) |
| | ) |
| Defendants. | ) |

# COMPLAINT
# JURY TRIAL DEMANDED

Plaintiff, Multifamily Captive Group, LLC, by and through its counsel, Patton Boggs, LLP, hereby alleges as follows:

## Parties

1. Plaintiff Multifamily Captive Group, LLC ("Multifamily") is a corporation organized and operating under the laws of the State of Maryland with its principal place of business located in the State of Maryland.

2. Defendant Lisa Isom ("Isom") is an individual domiciled in the State of Colorado.

3. Defendant Assurance Risk Managers, Inc. ("ARM") is a corporation organized under the laws of the State of Colorado with its principal place of business located in the State of Colorado. On information and belief, Isom is an owner and corporate representative of ARM.

4. Defendant Networked Insurance Agents, Inc. ("NIA") is a corporation organized under the laws of the State of California with its principal place of business located in the State of California.

5. Defendant California Apartment Association ("CAA") is a corporation organized under the laws of the State of California with its principal place of business located in the State of California.

4914258

2

## Jurisdiction and Venue

6.      Jurisdiction is proper pursuant to 28 USC §1332 in that the action is between citizens of different States and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

7.      Venue is proper in this judicial district and this Division pursuant to 28 U.S.C. § 1391, in that a substantial part of the events and omissions giving rise to the claims occurred within the State of Maryland and within the geographical limits of the Southern Division of this Court. A substantial amount of written and telephonic communications between the parties occurred while Multifamily was conducting business in Maryland. In addition, Multifamily was in Maryland when it entered into various agreements with the Defendants.

## Facts Common to All Claims

8.      Multifamily offers insurance programs tailored specifically for the multifamily and real estate property owner or manager. Multifamily brings together experts in residential and commercial real estate with authorities in insurance program management. Multifamily provides property owners alternate and guaranteed cost insurance solutions that protect insureds from large premium derivations from year to year.

9.      CAA's mission, according to their website http://www.caanet.org, is to represent the ethical members of the rental housing industry in all aspects of government affairs within the State of California and nationally, and to provide information, products, and services which contribute to the success of their businesses.

10.     Prior to February 1, 2006, CAA engaged Multifamily to create a Guaranteed Cost Property and Liability Program property and liability insurance program for its members.

11.     On or about February 7, 2006, CAA engaged Multifamily to perform additional work on its behalf and develop a new workers compensation insurance program (together with the Guaranteed Cost Property and Liability Program, the "Workers Compensation Program") for CAA to provide to its members. Multifamily was to be compensated for this work on behalf of CAA based on commissions derived from the value of the insurance program.

12.     On or about February 7, 2006, Multifamily contacted NIA, on CAA's behalf, to prepare and jointly present a proposed property and liability program to CAA. CAA and Multifamily also discussed utilizing NIA as a co-broker for the Workers Compensation Program. NIA agreed to work with Multifamily to prepare the joint proposal.

13.     As a result of Multifamily's communications with NIA concerning the joint proposal, NIA knew that Multifamily had a preexisting business relationship with CAA to establish the Workers Compensation Program.

14.     On or about March 24, 2006, Multifamily sponsored a meeting with NIA, CAA, and Multifamily to introduce the NIA Workers Compensation Program.

15.     On or about April 1, 2006, Multifamily presented its joint proposal with NIA to CAA.

16.     On or about June 21, 2006, CAA requested that Multifamily, on its behalf, check NIA's references.

17.     On or about June 21, 2006, NIA provided Multifamily with Isom and ARM as its references.

18. On or about July 31, 2006, Multifamily contacted Isom and ARM on behalf of CAA to check NIA's references.

19. On information and belief, Isom and ARM did not have any business or other relationship with CAA when Multifamily contacted them on or about July 31, 2006, to check NIA's references.

20. During their conversation on or about July 31, 2006, Isom and ARM informed Multifamily that they would not recommend NIA for any of CAA's insurance needs.

21. On or about July 31, 2006, CAA authorized Multifamily to exclusively market the Workers Compensation Program.

22. In reliance on Isom and ARM's recommendation that CAA should not use NIA for any insurance, including its Workers Compensation Program, Multifamily agreed to sever its relationship with NIA and find another insurer.

23. During their conversation on or about July 31, 2006, Multifamily, Isom, and ARM agreed to work together to prepare a proposed Workers Compensation Program for CAA. Multifamily, Isom, and ARM agreed to share any and all broker compensation associated with establishing the program.

24. As a result of Multifamily's communications with Isom and ARM on and prior to July 31, 2006, Isom and ARM knew that Multifamily had a preexisting business relationship with CAA to establish a Workers Compensation Program.

25. On or about July 31, 2006, in reliance on their agreement to jointly propose a Workers Compensation Program to CAA, Multifamily provided Isom and ARM information regarding CAA's members and program loss history.

26. On or about August 1, 2006, Isom and ARM represented to Multifamily that they had a business relationship with Hartford Insurance. Multifamily, Isom, and ARM agreed that Isom and ARM would contact Hartford Insurance to prepare a proposed Workers Compensation Program for CAA. However, Isom and ARM failed to obtain a proposed Workers Compensation Program from Hartford Insurance to present to CAA.

27. On or about October 1, 2006, Multifamily and CAA entered into an exclusive broker agreement (the "Exclusive Broker Agreement"), pursuant to which CAA agreed that Multifamily was its Exclusive Broker to establish its Workers Compensation Program. Subsequently, on numerous occasions, CAA orally confirmed and agreed that Multifamily was its Exclusive Broker.

28. On or about October 27, 2006, Multifamily contacted ACE Insurance Company on behalf of CAA to develop the Workers Compensation Program.

29. On or about October 27, 2006, Multifamily contacted Zurich Insurance Company on behalf of CAA to develop the Workers Compensation Program.

30. On or about November 1, 2006, Multifamily requested CAA to provide it with workers compensation data to present to Zurich Insurance and ACE Insurance to prepare a proposed Workers Compensation Program. CAA provided the requested information to Multifamily on or about November 3, 2006.

31. On or about November 3, 2006, CAA advised Multifamily that, as its Exclusive Broker, Multifamily needed to discretely negotiate with Zurich Insurance and ACE Insurance so that CAA's current insurance provider would not learn about CAA's efforts to establish a new Workers Compensation Program.

32. On or about November 3, 2006, Multifamily provided workers compensation data to Zurich Insurance.

33. On or about November 3, 2006, Multifamily provided workers compensation data to ACE Insurance.

34. On or about February 7, 2007, CAA and Multifamily met and proposed a viable first option for CAA's insurance coverage options, including, but not limited to, the planned Workers Compensation Program.

35. On or about February 7, 2007, CAA requested Multifamily, as its Exclusive Broker, to prepare a proposal for CAA to establish its own insurance agency.

36. On or about February 9, 2007, CAA requested Multifamily, as its Exclusive Broker, to provide it with the names of other associations that had established their own insurance agencies.

37. On or about February 11, 2007, Multifamily provided CAA with the names of other associations that had established their own insurance agencies.

38. On or about February 14, 2007, CAA provided Multifamily, as its Exclusive Broker, with information related to its desired Workers Compensation Program to present to multiple insurance carries.

39. On or about April 26, 2007, CAA and Multifamily, as CAA's Exclusive Broker, discussed options for CAA's Workers Compensation Program.

40. On or about April 26, 2007, Multifamily learned that Isom, ARM, and CAA had been secretly communicating with each other about the Workers Compensation Program in direct violation of Multifamily's Exclusive Broker Agreement with CAA.

41. On or about April 26, 2007, CAA directed Isom and ARM to contact Multifamily as the Exclusive Broker for CAA concerning the Workers Compensation Program.

42. On or about April 26, 2007, Isom and ARM admitted to Multifamily that they had been secretly communicating directly with CAA. Isom and ARM admitted that they were providing proposals to CAA to establish the Workers Compensation Program.

43. At the time Isom and ARM were communicating with CAA without Multifamily's knowledge, Isom and ARM knew that Multifamily had an established and preexisting broker relationship with CAA to establish the Workers Compensation Program.

44. On information and belief, Isom and ARM collaborated with NIA— after inducing Multifamily not to work with NIA on this engagement— to propose a Workers Compensation Program to CAA, to the exclusion of Multifamily.

45. On or about May 2, 2007, CAA provided Multifamily, its Exclusive Broker, confidential data concerning CAA's members to work with multiple insurance carriers and prepare proposed Workers Compensation Program options.

46. On or about May 8, 2007, Multifamily and ACE Insurance prepared a Workers Compensation Program for CAA.

47. On or about May 9, 2007, CAA and Multifamily worked together to finalize a proposal to CAA's Board of Directors to establish the Workers Compensation Program.

48.     On or about May 11, 2007, CAA provided additional confidential information to Multifamily to work with insurance carriers to further develop the Workers Compensation Program options.

49.     On or about May 18, 2007, Multifamily learned that CAA, in direction violation of the Exclusive Broker Agreement, sent a letter dated May 15, 2007 (the "Market Selection Letter"), to multiple insurance carriers authorizing Isom, ARM, and NIA to work with them to propose Workers Compensation Program options.

50.     On information and belief, CAA worked with Isom, ARM, and NIA to establish the Workers Compensation Program with ACE Insurance based on a proposal originally developed by Multifamily. CAA, Isom, ARM, and NIA excluded Multifamily from this proposed Workers Compensation Program.

51.     On information and belief, CAA, Isom, ARM, and NIA completed the Workers Compensation Program with ACE Insurance, to the exclusion of Multifamily and in direct violation of the Exclusive Broker Agreement.

## CLAIM ONE
## (Breach of Contract)
## (Defendant – CAA)

52.     Plaintiff re-alleges the averments of all the proceeding paragraphs of this Complaint and incorporates them herein.

53.     Plaintiff and CAA had an Exclusive Broker Agreement.

54.     Defendant CAA breached the Exclusive Broker Agreement by using Defendants Isom, ARM, and NIA as brokers to establish the Workers Compensation Program for CAA.

55. Defendant CAA breached the Exclusive Broker Agreement by failing and refusing to pay Plaintiff as its Exclusive Broker all of the commissions resulting from the establishment of the Workers Compensation Program.

56. As the direct and proximate result of the acts and omissions of Defendants, jointly and severally, Plaintiff has suffered losses of its interest as Exclusive Broker to CAA in securing multiple insurance needs, with compensatory damages including but not limited to at least the full value of commissions to be paid on the Workers Compensation Program for the life of the Program, which are believed to exceed $4,140,000.00

57. WHEREFORE Plaintiff demands judgment against CAA, including compensatory damages in an amount to be determined at trial but believed to exceed $4,140,000.00, plus costs in this action, its reasonable attorney's fees, and such further relief as justice requires.

### CLAIM TWO
### (Fraud)
### (Defendants CAA, Isom, and ARM)

58. Plaintiff re-alleges the averments of all the preceding paragraphs of this Complaint and incorporates them herein.

59. The acts and omissions of Defendants, jointly and severally, as alleged in this Complaint, constituted fraud, in that:

- CAA represented to Plaintiff that it was the Exclusive Broker for CAA.

- CAA represented to Plaintiff that it was the Exclusive Broker for the Workers Compensation Program.

- CAA represented to Plaintiff that it was the broker for working with ACE Insurance to prepare the Workers Compensation Program.

- CAA represented to Plaintiff that Isom and ARM were working for and at the discretion of Multifamily to develop the Workers Compensation Program

- Defendants represented to Multifamily that it would be paid all of the commissions resulting from the establishment of the Workers Compensation Program.

- Isom and ARM represented to Plaintiff that it should not use NIA for any of CAA's insurance needs.

60. The representations by Defendants were false.

61. These representations by Defendants concerned matters of material fact.

62. Defendants made these representations with the intent of inducing Plaintiff to rely upon such representations.

63. Plaintiff in fact relied on Defendants' representations by devoting a substantial amount of time, effort, and expense to develop the Workers Compensation Program. Plaintiff also relied on Defendants' representations when it contributed its confidential and proprietary work product concerning the Workers Compensation Program (*i.e.*, its time, effort, and expense to develop the Program, as well as the results thereof) to Defendants.

64. Plaintiff's reliance was justified.

65. The acts and omissions of Defendants were willful, intentional, purposeful, and taken for the purpose of deceiving Plaintiff. As a result, Defendants received commissions to which Plaintiff was entitled.

66. As a direct and proximate result of the reliance by Plaintiff on the representations of Defendants as alleged herein, Plaintiff has suffered compensatory damages including but not limited to at least the full value of commissions to be paid on the Workers Compensation Program for the life of the Program, which are believed to exceed $4,140,000.00

67. WHEREFORE Plaintiff demands judgment against Defendants, jointly and severally, including compensatory damages in an amount to be determined at trial but believed to exceed $4,140,000.00; punitive damages in an amount to be determined at trial; its costs in this action; reasonable attorney fees; and such further relief as justice requires.

## CLAIM THREE
### (Detrimental Reliance/Unjust Enrichment)
### (Defendants CAA, Isom, ARM, and NIA)

68. Plaintiff re-alleges the averments of all the proceeding paragraphs of this Complaint and incorporates them herein.

69. In reasonable reliance on Defendants' representations, as set forth above, Plaintiff spent a substantial amount of time, effort, and expense to develop the Workers Compensation Program for CAA.

70. Plaintiff contributed its confidential and proprietary work product concerning the Workers Compensation Program (*i.e.*, its time, effort, and expense to develop the Program, as well as the results thereof) to Defendants.

71. Defendants accepted and retained Plaintiff's confidential and proprietary work product concerning the Workers Compensation Program.

72. Defendants used and benefited from Plaintiff's confidential and proprietary work product when they used it to establish the Workers Compensation Program.

73. Defendants did not compensate Plaintiff for the value of its confidential and proprietary work product concerning the Workers Compensation Program.

74. It is inequitable for Defendants to benefit from Plaintiff's confidential and proprietary work product concerning the Workers Compensation Program without compensating Plaintiff for such work product.

75. As a result of Defendants' failure to compensate Plaintiff for the value of its confidential and proprietary work product, Plaintiff has suffered compensatory damages including but not limited to

at least the full value of commissions to be paid on the Workers Compensation Program for the life of the Program, which are believed to exceed $4,140,000.00

76. WHEREFORE Plaintiff demands judgment against Defendants, jointly and severally, including compensatory damages in an amount to be determined at trial but believed to exceed $4,140,000.00; its costs in this action; its reasonable attorney's fees; and such further relief as justice requires.

### CLAIM FOUR
### (Tortious Interference with Contractual Relations)
### (Isom, ARM, and NIA)

77. Plaintiff re-alleges the averments of all the proceeding paragraphs of this Complaint and incorporates them herein.

78. On or about October 1, 2006, Multifamily and CAA entered into the Exclusive Broker Agreement, pursuant to which CAA agreed that Multifamily was its Exclusive Broker to establish its Workers Compensation Program. Subsequently, on numerous occasions, CAA orally confirmed and agreed that Multifamily was its Exclusive Broker.

79. Defendants Isom, ARM, and NIA, knew or should have known that Multifamily was the Exclusive Broker by agreement to Defendant CAA.

80. Defendants Isom, ARM, and NIA, without justification, intentionally induced Defendant CAA to breach its Exclusive Broker Agreement with Multifamily by:

- Using Defendants Isom, ARM, and NIA as brokers to establish the Workers Compensation Program for CAA.

- Failing and refusing to pay Plaintiff as its Exclusive Broker all of the commissions resulting from the establishment of the Workers Compensation Program.

81. Multifamily has suffered damages as a direct result of Defendants Isom, ARM, and NIA's tortious interference. Multifamily's damages include the loss of compensation for work performed under the Exclusive Broker Agreement and the loss of business and good will, as well as compensatory damages including but not limited to at least the full value of commissions to be paid on the Workers Compensation Program for the life of the Program, which are believed to exceed $4,140,000.00.

82. WHEREFORE Plaintiff demands judgment against Defendants, jointly and severally, including compensatory damages in an amount to be determined at trial but believed to exceed $4,140,000.00; its costs in this action; its reasonable attorney's fees; and such further relief as justice requires.

### CLAIM FIVE
### (Tortious Interference with Prospective Advantage)
### (Isom, ARM, and NIA)

83. Plaintiff re-alleges the averments of all the proceeding paragraphs of this Complaint and incorporates them herein.

84. Defendants Isom, ARM, and NIA were aware of the nature of Multifamily's business and the identity of its customers.

85. Defendants Isom, ARM, and NIA were aware of the nature of Multifamily's business relationship with CAA, including the Exclusive Broker Agreement, and the creation of the Workers Compensation Program.

86. Defendants Isom, ARM, and NIA intentionally and willfully acted to cause damage to Multifamily in its lawful business, including by inducing or otherwise causing Multifamily's

customers not to enter into or continue their business relationship with Multifamily, and by preventing Multifamily from acquiring or continuing its business relationship with its customers.

87.     Defendants' acts were without right or justification.

88.     Multifamily has suffered damages as a direct result of Defendants' tortious interference. Multifamily's damages include the loss of business and good will as well as compensatory damages including but not limited to at least the full value of commissions paid by ACE Insurance on the Workers Compensation Program for the life of the Program, which are believed to exceed $4,140,000.00.

89.     WHEREFORE Plaintiff demands judgment against Defendants, jointly and severally, including compensatory damages in an amount to be determined at trial but believed to exceed $4,140,000.00; its costs in this action; its reasonable attorney's fees; and such further relief as justice requires.

## CLAIM SIX
## (Conspiracy)
## (Defendants CAA, Isom, ARM, and NIA)

90.     Plaintiff re-alleges the averments of all the proceeding paragraphs of this Complaint and incorporates them herein.

91.     Defendants, by agreement, collusion, or understanding, engaged in a conspiracy to unlawfully deprive Multifamily of the benefits of the Exclusive Broker Agreement and compensation for its confidential and proprietary work product concerning the Workers Compensation Program.

92. Defendants, by agreement, collusion, or understanding, engaged in a conspiracy by doing the following:

- In violation of CAA's Exclusive Broker Agreement with Multifamily, Defendants CAA worked with Isom, ARM, and NIA as brokers for the Workers Compensation Program.

- Defendants intentionally mislead Multifamily to believe that it was the Exclusive Broker for the Workers Compensation Program.

- CAA misrepresented to Plaintiff that it was the broker for working with ACE Insurance to prepare the Workers Compensation Program.

- Defendants intentionally misrepresented to Multifamily that Isom and ARM were working for and at the discretion of Multifamily to develop the Workers Compensation Program.

- Defendants intentionally misrepresented to Multifamily that it would be paid all of the commissions resulting from the establishment of the Workers Compensation Program.

93. By the above, Defendants intentionally induced Multifamily to spend a substantial amount of time, effort, and expense to develop the Workers Compensation Program for CAA, and to contribute its confidential and proprietary work product concerning the Workers Compensation Program (*i.e.*, its time, effort, and expense to develop the Program, as well as the results thereof) to Defendants.

94. Defendants have willfully, maliciously, intentionally, and with reckless disregard of Plaintiff's rights entered into agreements with the intent to advance their own individual and collective interests by breaching the Exclusive Broker Agreement and utilizing the confidential and proprietary work product of Plaintiff without compensation.

95. In furtherance of this conspiracy, Defendants engaged in the conduct described herein, which conduct was and remains unlawful.

96.    The combination of Defendants' impermissible and illegal actions have undermined Plaintiff's business interests and caused irreparable financial losses to Plaintiff.

97.    This conduct has directly and proximately caused irreparable harm to Plaintiff, and will continue to do so.

98.    The Defendants' intentional, knowing, reckless, willful, wanton conduct has inured to the Defendants' benefit and to Plaintiff's detriment, causing irreparable injury to Plaintiff, including compensatory damages including but not limited to at least the full value of commissions to be paid on the Workers Compensation Program for the life of the Program, which are believed to exceed $4,140,000.00.

99.    WHEREFORE Plaintiff demands judgment against Defendants, jointly and severally, including compensatory damages in an amount to be determined at trial but believed to exceed $4,140,000.00; punitive damages in an amount to be determined at trial; its costs in this action; reasonable attorney fees; and such further relief as justice requires.

Respectfully Submitted,

_____
Edward Wisneski (Fed. Bar No. 23618)
T. Michael Guiffré
David C. Silver
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
(202) 457-6000
(202) 457-6315 (facsimile)

Attorneys for Plaintiff
Multifamily Captive Group, LLC